ACCEPTED
12-14-00158-CR
TWELFTH COURT OF APPEALS
TYLER, TEXAS
9/11/2015 5:17:19 PM
Pam Estes
CLERK

CAUSE NO. 12-14-00158-CR

IN THE

THE 12th DISTRICT COURT OF APPEALS

RECEIVED IN
12th COURT OF APPEALS
TYLER, TEXAS
9/11/2015 5:17:19 PM
PAM ESTES
Clerk

FOR THE

STATE OF TEXAS

FILED

9/11/2015

Twelfth Court of Appeals
Pam Estes
Clerk

RICKY NEAL, JR.

APPELLANT

V.

THE STATE OF TEXAS,

APPELLEE

## STATE'S REPLY TO APPELLANT'S BRIEF

D. MATT BINGHAM
Criminal District Attorney
Smith County, Texas

MICHAEL J. WEST
Assistant Criminal District Attorney
Bar I.D. No. 21203300
Smith County Courthouse
100 N. Broadway
Tyler, Texas 75702
ph: (903) 590-1720
fax: (903) 590-1719

**ORAL ARGUMENT NOT REQUESTED**

# TABLE OF CONTENTS

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

REPLY TO APPELLANT'S POINTS OF ERROR . . . . . . . . . . . . . . . . . . . . . . . . . 2

COUNTERPOINT ONE: The evidence at trial was legally sufficient
to establish all the elements of the offense alleged . . . . . . . . . . . . . . . . . 2

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

COUNTERPOINT TWO: The trial court properly excluded character
evidence that the victim may have allegedly been a gang member . . . . 28

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

COUNTERPOINT THREE: The contentions raised in Appellant's third
point of error should be overruled as multifarious. Alternatively,
the trial court did not err in the exclusion of evidence concerning
the victim's alleged membership in a criminal street gang . . . . . . . . . . 33

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

COUNTERPOINT FOUR: The trial court properly charged the jury on
the law of self-defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

COUNTERPOINT FIVE: Where the trial court properly charged the
jury on the law of self-defense, a charge on necessity was not
applicable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**COUNTERPOINT SIX: The trial court properly excluded the hearsay testimony of Mr. Wilmon Davis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

**COUNTERPOINT SEVEN: The law does not support that Appellant's trial counsel was ineffective, or that Appellant was harmed as a result** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

**COUNTERPOINT EIGHT: The Trial Court did not err in denying Appellant's requested lesser include offense charges where they were not supported by the evidence** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

**COUNTERPOINT NINE: The Trial Court did not err in denying Appellant's requested instruction on sudden passion where it was not supported by the evidence** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

**INDEX OF AUTHORITIES**

**STATUTE/RULES**                                                              **PAGE**

**TEX. PENAL CODE ANN. (Vernon 2013)**

| | |
|---|---|
| § 1.07 (a) (42) | 8, 27 |
| § 6.03 (d) | 55 |
| § 9.22 | 42 |
| § 9.31 (a) | 6 |
| § 9.31(b)(5)(A) | 38, 40 |
| § 9.32 | passim |
| § 19.02 (b) (1) | 5 |
| § 19.02 (b) (2) | 5 |
| § 19.02 (d) | 58 |
| § 19.05 | 55 |
| § 22.05 | 56 |
| § 46.02 (a) (2) | 40 |

**TEX. CODE CRIM. PROC. ANN. (Vernon 2014)**

| | |
|---|---|
| Art. 37.09 (1) | 56 |

**TEX. R. APP. PROC. (Vernon 2015)**

| | |
|---|---|
| Rule 38.1 (i) | 32 |

**TEX. R. EVID.**

| | |
|---|---|
| Rule 801 | 46 |
| Rule 802 | 46 |
| Rule 803 (1) | 47 |
| Rule 803 (2) | 46 |

**FEDERAL CASES**                                                                **PAGE**

| | |
|---|---|
| *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) | passim |

**FEDERAL CASES** **(CONT.)**                                          **PAGE**

*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052,
80 L.Ed.2d 674 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   passim

**STATE CASES**                                                        **PAGE**

*Alaniz v. State*, 937 S.W.2d 593
(Tex.App. - San Antonio 1996, *no pet*.) . . . . . . . . . . . . . . . . . . . . . . . . .   50

*Almanza v. State*, 686 S.W.2d 157
(Tex.Crim.App. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37

*Alonzo v. State*, 353 S.W.3d 778
(Tex.Crim.App. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   54

*Anderson v. State*, 701 S.W.2d 868
(Tex.Crim.App. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

*Benavides v. State*, 992 S.W.2d 511
(Tex.App. - Houston [1ˢᵗ Dist.] 1999, *pet. ref'd*) . . . . . . . . . . . . . . . . . . .   58

*Bumguardner v. State*, 963 S.W.2d 171
(Tex. App. - Waco 1998, *pet. ref'd*) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38

*Butler v. State*, 663 S.W.2d 492
(Tex.App. - Dallas 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42

*Cain v. State*, 958 S.W.2d 404
(Tex.Crim.App. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

*Carrillo v. State,* 98 S.W.3d 789
(Tex.App. - Amarillo 2003, *pet. ref'd*) . . . . . . . . . . . . . . . . . . . . . . . . . .   43

*Cavazos v. State*, 382 S.W.3d 377
(Tex.Crim.App. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   52, 53

**S̲T̲A̲T̲E̲ ̲C̲A̲S̲E̲S̲  (CONT.)**                                                                                           **P̲A̲G̲E̲**

*Clayton v. State*, 235 S.W.3d 772
(Tex.Crim.App. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    27

*Daniels v. State*, 645 S.W.2d 459
(Tex.Crim.App. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    59

*Davis v. State*, 840 S.W.2d 480
(Tex.App. – Tyler 1992, *pet. ref'd*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    27

*Dewberry v. State*, 4 S.W.3d 735
(Tex.Crim.App. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

*Edmond v. State*, 116 S.W.3d 110
(Tex.App. - Houston [14[th] Dist.] 2002, *pet. ref'd*) . . . . . . . . . . . . . . . . . .    51

*Ex parte Miller*, 330 S.W.3d 610
(Tex.Crim.App. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    passim

*Ex parte Zepeda*, 819 S.W.2d 874
(Tex.Crim.App. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    50

*Fink v. State*, 97 S.W.3d 739
(Tex.App. - Austin 2003, *pet. ref'd*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    38

*Ferguson v. State*, 97 S.W.3d 293
(Tex.App. - Houston [14[th] Dist.] 2003, *pet. ref'd*) . . . . . . . . . . . . . . . . . .    47

*Gonzales v. State*, 717 S.W.2d 355
(Tex.Crim.App. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    59

*Hall v. State*, 225 S.W.3d 524
(Tex.Crim.App. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    52, 53

*Hernandez v. State*, 726 S.W.2d 53
(Tex.Crim.App. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    48

**S**TATE **C**ASES **(CONT.)**                                                       **P**AGE

*Hernandez v. State*, 127 S.W.3d 206
(Tex.App. - Houston [1ˢᵗ Dist.] 2003, *pet. ref'd*) . . . . . . . . . . . . . . . . . . . .    58

*Hooper v. State*, 214 S.W.3d 9
(Tex.Crim.App. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

*Hunter v. State*, No. 14-08-00202-CR, 2008 Tex.App. LEXIS 9139
(Tex.App. - Houston [14ᵗʰ Dist.] Dec. 9, 2008, *no pet.*)
(not designated for publication) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    43

*Jenkins v. State*, 740 S.W.2d 435
(Tex. Crim.App. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5

*Kemp v. State*, 892 S.W.2d 112
(Tex.App.-Houston [1ˢᵗ Dist.] 1994, *pet. ref'd*) . . . . . . . . . . . . . . . . . . . .    50

*Laster v. State*, 275 S.W.3d 512
(Tex.Crim.App. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

*Lee v. State*, 259 S.W.3d 785
(Tex. App. - Houston [1ˢᵗ Dist.] 2007, *pet. ref'd*) . . . . . . . . . . . . . . . . . .    38

*Lucio v. State*, 351 S.W.3d 878
(Tex.Crim.App. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    26

*Lugo v. State*, 667 S.W.2d 144
(Tex.Crim.App. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    55

*Martinez v. State*, 91 S.W.3d 331
(Tex.Crim.App. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    29, 33

*Martinez v. State*, 16 S.W.3d 845
(Tex.App. - Houston [1ˢᵗ Dist.] 2000, *pet. ref'd*) . . . . . . . . . . . . . . . . . . .    54, 55

**STATE CASES (CONT.)**                                         **PAGE**

*McFarland v. State*, 845 S.W.2d 824
(Tex. Crim.App.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     49

*McKinney v. State*, 179 S.W.3d 565
(Tex.Crim.App. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     58

*Michael v. State*, 864 S.W.2d 104
(Tex.App. -  Dallas 1993, *no pet*.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     35

*Miller v. State*, 177 S.W.3d 177
(Tex.App. - Houston [1ˢᵗ Dist.] 2005, *pet. ref'd*) . . . . . . . . . . . . . . . . . . .     54, 55

*Moncivais v. State*, 425 S.W.3d 403
(Tex.App.-Houston [1ˢᵗ Dist.] 2011, *pet. ref'd*) . . . . . . . . . . . . . . . . . . .     58

*Montgomery v. State*, 810 S.W.2d 372
(Tex.Crim.App. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     29

*Moore v. State*, 392 S.W.3d 697
(Tex. App. Dallas 2010, *no pet*.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     40

*Murphy v. State*, 864 S.W.2d 70
(Tex.App. - Tyler 1992, *pet. ref'd*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     35

*Ortiz v. State*, 144 S.W.3d 225
(Tex.App. - Houston [14ᵗʰ Dist.] 2004, *pet. ref'd*) . . . . . . . . . . . . . . . . . .     56

*Rios v. State*, 990 S.W.2d 382
(Tex.App. - Amarillo 1999, *no pet*.) . . . . . . . . . . . . . . . . . . . . . . . . . . . .     49

*Saxton v. State*, 804 S.W.2d 910
(Tex.Crim.App. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     passim

**STATE CASES (CONT.)**                                                     **PAGE**

*Sandoval v. State*, No. 12-12-00366-CR, 2013 Tex.App. LEXIS 9497
(Tex.App. - Tyler July 31, 2013, *pet. ref'd*)
(not designated for publication) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     51

*Searcy v. State*, 231 S.W.3d 539
(Tex.App. - Texarkana 2007, *pet. ref'd*) . . . . . . . . . . . . . . . . . . . . . . . . .     42

*Sterling v. State*, 800 S.W.2d 513
(Tex.Crim.App. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     35

*Sweed v. State*, 351 S.W.3d 63
(Tex.Crim.App. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     56

*Thompson v. State*, 9 S.W.3d 808
(Tex.Crim.App. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     50

*Torres v. State*, 71 S.W.3d 758
(Tex.Crim.App. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     29

*Whipple v. State*, 281 S.W.3d 482
(Tex.App. – El Paso 2008, *pet. ref'd*) . . . . . . . . . . . . . . . . . . . . . . . . . . .     27

*Wilson v. State*, No. 06-14-00021-CR, 2014 Tex.App. LEXIS 12188
(Tex.App. - Texarkana Nov. 7, 2014, *pet. ref'd*)
(not designated for publication) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     43

*Wood v. State*, 18 S.W.3d 642
(Tex.Crim.App. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     47

*Zuliani v. State*, 97 S.W.3d 589
(Tex.Crim.App. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     4, 46

CAUSE NO. 12-14-00158-CR

IN THE

THE 12th DISTRICT COURT OF APPEALS

FOR THE

STATE OF TEXAS

RICKY NEAL, JR.,

APPELLANT

V.

THE STATE OF TEXAS,

APPELLEE

**STATE'S REPLY TO APPELLANT'S BRIEF**

**TO THE HONORABLE COURT OF APPEALS**:

Comes now the State of Texas, by and through the undersigned Assistant Criminal District Attorney, and respectfully urges this Court to overrule Appellant's alleged errors and affirm the judgment of the trial court in the above-numbered cause.

STATEMENT OF THE CASE

Appellant, Ricky Neal, Jr., was indicted in Cause No. 007-0505-13, filed in the 7th District Court of Smith County, Texas, with the offense of Murder. (CR: 1). From

1

April 29, 2014, through May 7, 2014, the case was tried to a jury and Appellant convicted of the offense alleged by the indictment. (RR 18: 11). The same jury, after hearing evidence and argument of counsel, assessed a sentence of Life confinement in the Texas Department of Criminal Justice - Institutional Division and no fine. (Supp RR 1: 34).

Appellant gave timely notice of appeal, counsel was appointed, and a brief filed with the Court. The State's brief will be timely filed if the Courtgrants the attached motion for extension.

## STATEMENT OF FACTS

Appellant has accurately stated the essential nature of the evidence presented at his trial. In the interest of judicial economy any other facts not mentioned herein that may be relevant to disposition of Appellant's points of error will be discussed in the State's argument in response to those points.

## REPLY TO APPELLANT'S POINTS OF ERROR AND SUMMARY OF ARGUMENT

**COUNTERPOINT ONE: The evidence at trial was legally sufficient to establish all the elements of the offense alleged.**

**A.      Summary of Argument**

Appellant complains under his first point of error that the State's evidence was insufficient to support the jury's verdict where it failed to rebut his claim of self

defense. (Appellant's brief at 6-12). However, The State presented testimony from which the jury could have found beyond a reasonable doubt that Appellant intentionally and knowing caused the death of the victim in this case as alleged in the indictment.

## B. Standard of Review

Articulating the standard of review for legal sufficiency in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), the Supreme Court stated that, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." "[T]his same standard applies equally to circumstantial and direct evidence." *Laster v. State*, 275 S.W.3d 512, 517 (Tex.Crim.App. 2009). When examining the evidence for legal sufficiency, a reviewing court's role is not to become a "thirteenth juror", and it may not "re-evaluate the weight and credibility of the record evidence" and thereby substitute its judgment for that of the jury. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex.Crim.App. 1999).

Thus, "[t]he reviewing court must give deference to the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007) *citing Jackson*, 443 U.S. at 318-19. In cases involving

3

a claim of self-defense, the defendant has the initial burden of producing evidence to raise self-defense; the State then has the final burden of persuasion to disprove it. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex.Crim.App. 1991). The State is not obligated to offer evidence refuting a claim of self-defense; rather, the State is required to prove its case beyond a reasonable doubt. *Id*. When a fact finder determines that the defendant is guilty, there is an implicit finding against the defensive theory. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex.Crim.App. 2003) *citing Saxton*, 804 S.W.2d at 914).

When an appellant challenges the legal sufficiency of the evidence supporting a jury's rejection of self-defense, the Court should not look "to whether the State presented evidence which refuted the appellant's self-defense testimony, but rather determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements" of murder "beyond a reasonable doubt and also would have found against the appellant on the self-defense issue beyond a reasonable doubt." *Saxton*, 804 S.W.2d at 914.

## C.    Application to the Facts of the Case

Under his first point of error, Appellant complains that the evidence at trial was insufficient to support the jury's verdict of guilt over evidence he claims established that he acted in self-defense.  (Appellant's brief at 6-12). The indictment here alleged

4

in its relevant part that Appellant "did then and there intentionally or knowingly cause the death of an individual, namely Christopher Mass, by shooting Christopher Mass with a firearm . . ." (CR:1); TEX. PENAL CODE ANN. § 19.02 (b) (1) (Vernon 2013). The indictment contained a second paragraph alleging that Appellant "did then and there, with the intent to cause serious bodily injury to an individual, namely Christopher Mass, commit an act clearly dangerous to human life that caused the death of said Christopher Mass, by shooting Christopher Mass with a firearm . . ." (CR:1); TEX. PENAL CODE ANN. § 19.02 (b) (2) (Vernon 2013). Appellant argues that the jury erred in rejecting his self-defense claim and convicting him of murder.

As charged in the indictment, the State had to show that Appellant did intentionally or knowingly cause the death of Christopher Mass. (CR: 1). As the Court of Criminal Appeals explained in *Saxton*:

> [T]he State has the burden of persuasion in disproving the evidence of self-defense. That is not a burden of production, i.e., one which requires the State to affirmatively produce evidence refuting the self-defense claim, but rather a burden requiring the State to prove its case beyond a reasonable doubt. Secondly, and more importantly, case law instructs us that the issue of self-defense is an issue of fact to be determined by the jury.
> *Saxton*, 804 S.W.2d at 913 (citation omitted).

"A jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory." *Id*. at 914 *citing Jenkins v. State*, 740 S.W.2d 435, 438 (Tex.

5

Crim.App. 1983). Section 9.31 of the Texas Penal Code provides in pertinent part:

Except as provided in Subsection (b), a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force. The actor's belief that the force was immediately necessary as described by this subsection is presumed to be reasonable if the actor:

(1) knew or had reason to believe that the person against whom the force was used:

(A) unlawfully and with force entered, or was attempting to enter unlawfully and with force, the actor's occupied habitation, vehicle, or place of business or employment;

(B) unlawfully and with force removed, or was attempting to remove unlawfully and with force, the actor from the actor's habitation, vehicle, or place of business or employment; or

(C) was committing or attempting to commit aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery;

(2) did not provoke the person against whom the force was used; and

(3) was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used.

TEX. PENAL CODE ANN. § 9.31 (a) (Vernon 2013).

Penal Code Section 9.32 in part allows for the use of deadly force in self-defense in the following limited circumstances:

(a) A person is justified in using deadly force against another:

6

(1) if the actor would be justified in using force against the other under Section 9.31; and

(2) when and to the degree the actor reasonably believes the deadly force is immediately necessary:

(A) to protect the actor against the other's use or attempted use of unlawful deadly force; or

(B) [omitted]

(b) The actor's belief under Subsection (a)(2) that the deadly force was immediately necessary as described by that subdivision is presumed to be reasonable if the actor:

(1) knew or had reason to believe that the person against whom the deadly force was used:

 (A) unlawfully and with force entered, or was attempting to enter unlawfully and with force, the actor's occupied habitation, vehicle, or place of business or employment;

 (B) unlawfully and with force removed, or was attempting to remove unlawfully and with force, the actor from the actor's habitation, vehicle, or place of business or employment; or

(C) was committing or attempting to commit an offense described by Subsection (a)(2)(B);

(2) did not provoke the person against whom the force was used; and

(3) was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used.

TEX. PENAL CODE ANN. § 9.32 (a), (b) (Vernon 2013).

7

"'Reasonable belief' means a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." TEX. PENAL CODE ANN. § 1.07 (a) (42) (Vernon 2013).

Appellant argues that the evidence showed his use of deadly force was immediately necessary after he was "confronted" by the victim and another man, Jonathan Dews. (Appellant's brief at 12). Appellant claims that it was "not disputed" that the two men "pursued" him in order to fight him and that they were the "aggressors in this exchange." *Id*.

These assertions are completely adverse to the evidence before the jury. The evidence instead shows that Appellant confronted Jonathan Dews in the mall and challenged or provoked him to come outside the mall and fight. If the men "pursued" Appellant at all, and the record says they did not, it was at his request.

The victim, Christopher Mass, accompanied Dews outside and was standing approximately 20 feet away when Appellant reached into a car to get a pistol and began shooting at the victim. There was no evidence at trial that weapons of any sort were being displayed by Dews, or the victim, before the shooting. The victim was not charging at Appellant when he was killed and there is no evidence in the record that he had stated out loud any intent to harm Appellant before Appellant started shooting. Appellant later told police that he was not threatened by Dews and that he shot the

victim because merely because he couldn't' see his hands and thought that he might be armed.

Consequently, the evidence presented to the jury failed in any way to establish that Appellant had a reasonable belief that deadly force was immediately necessary to protect himself. The relevant portions of the State's case include the following testimony:

1.     The State's first witness was **Mr. Jonathan Dews**. (RR 14:18). He testified that on the date of the offense, February 9, 2013, he went to the mall early in the morning to buy shoes for his children and his wife. (RR 14: 21). He was by himself when he went to the mall. (RR 14: 22). While at the mall, Mr. Dews ran into two acquaintances, Mr, Jimmy Whitt and the victim, Christopher Mass. (RR 14: 24-27). After speaking briefly to these men, Mr. Dews sat alone by himself at a table outside the Chick-Fil-A food store. (RR 14: 32).  At some point while Mr. Dews was looking online at his phone, Appellant had walked up to his table and was looking down at him. (RR 14: 35).

The jury heard that while Mr. Dews was in prison on a drug delivery charge, his wife had developed some sort of relationship with Appellant. (RR 14: 36). After he got home from prison, Mr. Dews had seen a text message from Appellant to his wife asking her why she had gone back to Mr. Dews. (RR 14: 36). Dews replied to

the text message telling Appellant to stay out of his business. (RR 14: 36). He did not know who Appellant was at that time. (RR 14: 37). He then recalled an incident that occurred two weeks before the shooting where he and his wife went to a store in the mall where Appellant worked and that Appellant was "was acting strange, like he knew me." (RR 14: 38). No words were exchanged at that time and it was only later that Dews learned from a friend that it had been Appellant who was acting strangely towards him. (RR 14: 38-39). With that background, the following exchange occurred between the two when Appellant approached Dews while he was sitting at the table outside Chick-Fil-A:

> Q.      Okay. What happens once you notice Ricky Neal?
>
> A.      I looked up at him and I asked him, "Do we have a problem?"
>         And -- I don't know if I can say what he said.
>
> Q.      Yeah, what did he say to you?
>
> A.      He said, "You don't know me and I don't know you and we going
>         to keep it that way."
>
> Q.      Okay.
>
> A.      I replied back asking him, "What you mean by that?" And he
>         replied back, "You don't know me and I don't know you. We
>         going to keep it that way." And, therefore, I stood up and said,
>         "What you talking about?" And he stood back and told me, "I'm
>         going to show you about me. I'm going to go put on my shoes."
>         He left out the exit.
>
> (RR 14: 40).

Mr. Dews interpreted this encounter as a challenge to fight and Appellant waved for him to follow him outside to the parking lot. (RR 14: 42). Mr. Jimmy Whitt tried to discourage Dews from leaving the mall and told him "Don't worry about him." (RR 14: 42). Dews ignored Whitts' advice and went outside. (RR 14: 42). The victim had also noticed the confrontation and followed Dews as he was walking outside asking him what was going on. (RR 14: 43). Mr. Dews told the jury that he was walking outside to fight with Appellant. (RR 14: 43). Mr. Whitt followed as well and both he and the victim came out of the mall together behind Dews. (RR 14: 44).

Outside, Appellant told Dews that he should have come out by himself and he began to unbutton his shirt to take it off. (RR 14: 47-48). At that point, Mr. Dews first realized that the victim had followed him out from the mall. (RR 14: 48). He turned and looked back and saw Mr. Mass take off his hoodie and throw it into a car. (RR 14: 49). Appellant asked Dews if he and Mass were trying to "jump" him and Dews said "No." (RR 14: 50). The jury heard that the victim then remained standing by his car. (RR 14: 51-52). Dews then approached Appellant to fight. (RR 14: 52).

While the victim stood with his arms crossed, Appellant asked him who he was and the victim replied "I'm looking out for my homeboy." (RR 14: 52). Appellant then said "I'm going to show y'all about me" and he reached and grabbed a gun and cocked it and pointed it at the victim. (RR 14: 52). Dews put his hands up and said "It ain't

11

that type of party," and he was backing away from Appellant when the shooting started. (RR 14: 55-57). At the point that Appellant started shooting, neither Dews nor the victim were approaching him. (RR 14: 56-57). The victim was still standing by his car with his arms crossed when the shooting started. (RR 14: 57). Dews started running away from the scene and Appellant shot at him as well. (RR 14: 58). He saw that Christopher Mass had fallen on the ground by his car. (RR 14: 59). Before the shooting, Appellant had focused his full attention on the victim for approximately "seven to eight seconds." (RR 14: 59-60). The victim had not moved from the spot where he fell and was not charging towards Appellant before the shooting started. (RR 14: 61). Dews himself was backing up at the time that Appellant began to fire his gun. (RR 14: 61). Dews testified that he did not have a weapon with him at the time. (RR 14: 61).

Mr. Dews told the jury that he had followed Appellant out from the mall because he felt that he had been invited to fight by Appellant. (RR 14: 62). He did not ask either Whitts or the victim to help him fight with Appellant. (RR 14: 62). Dews did not see the victim with a weapon and did not see him make any movement that indicated that he was trying to get a weapon. (RR 14: 62). Approximately 30 seconds after the shooting, Dews saw people running over to the victim to help him, but he did not see anyone remove anything from the area around the victim. (RR 14: 63-64).

12

Dews testified that he had heard "three or four" total shots being fired during the incident. (RR 14: 65).

On re-direct examination Mr. Dews testified that he did not talk to the victim or Mr. Whitt before he went to the mall the morning of the shooting. (RR 14: 201-02). The jury heard that when Appellant stood at the table where Dews was sitting and stared at Dews, he was asked if he had a problem. (RR 14: 205-06). This led to the conversation described above, the effect of which was to cause Mr. Dews to believe that he was going to get into a fight with Appellant. (RR 14: 207). He told the jury that when Appellant was leaving the mall to go outside, he gestured with his hand and said "Come on" to Mr. Dews. (RR 14: 208). When Dews followed Appellant out, he saw that the victim had stopped following him in order to speak to a female that came up to him while he was leaving the mall. (RR 14: 211).

When Appellant pulled the gun out of his car, he held it up and cocked it and said "I'm going to show y'all about me." (RR 14: 216). It was at that point that Mr. Whitt ran up to Appellant and told him that no one was trying to jump him. (RR 14: 216). Before Appellant fired, no one had threatened to shoot or stab him and no one had used any force against him. (RR 14: 218). In fact, once the gun was drawn, Dews backed away and the victim was still standing by his car in a position further away from Appellant than Dews. (RR 14: 218). The victim's arms were crossed when he

13

got shot and Mr. Dews testified that they were still crossed as he fell to the ground. (RR 14: 218-19).

**2.**     The State then called **Mr. Jimmy Whitt**. He testified that he went early to the mall to buy a new style of shoe that was coming out that day. (RR 14: 228). He saw Christopher Mass at the mall and told the jury that he knew Mass pretty well and that they were good friends. (RR 14: 231). Whitt told the jury that he merely knew who Jonathan Dews was, but was not friends with him. (RR 14: 232).

Mr. Whitt also knew Appellant and saw him when he came into the mall. 9RR 14: 234). He heard a heated conversation between Appellant and Dews and understood from it that they were going to go outside and fight. (RR 14: 235). Mr. Whitt said he heard Appellant say to Dews "come outside if he wanted to box; his shoes was in the car." (RR 14: 236). He also saw Appellant motion towards Dews "[k]ind of waved his hand like, "Come on." (RR 14: 237).

Mr. Whitt told the jury that before Appellant showed up at the mall, he and Dews and the victim did not talk about him and did not know he was coming to the mall. (RR 14: 239). The jury saw a mall security video showing Appellant making the motion towards Dews, and Mr. Whitt told them that, when he made that motion, Appellant said to Dews "Come outside if you want to box." (RR 14: 243). Whitt testified that the victim was not involved in the altercation and had merely gone

14

outside to watch the fight. (RR 14: 244). He told the jury that he went outside to try to stop the fight because "I don't want to see nobody going to jail that day." (RR 14: 245). Like Mr. Dews, Mr. Whitt told the jury that when he went outside he did not have a weapon of any kind with him. (RR 14: 246). When he got outside, he told the jury that:

> I see Mass with his door open. And he was taking off his sweater. And I see Dews standing at the back of the car. Walk a little further, I see a young lady getting out the front seat of Ricky's car. And she was walking towards the mall. On the other side of the car I see Ricky in the back seat.
>
> (RR 14: 246).

He approached Appellant in the back seat of his car and said to him "Man, y'all don't need to be doing this." (RR 14: 247). Mr. Whitt continued:

> Then when he came out the back seat, he had a gun. And he had cocked the gun, and he walked toward the back of the car, like, towards Mass and then stopped at the back of the car. Then he pointed the gun at Mass. And I tell him, "Man, put the gun down. If y'all going to fight, y'all going to fight. You don't need to have a weapon or whatever." Then he just kept saying, "No. Y'all trying to jump me." And they was like, "No, we ain't trying to jump you." Then Dews told him, "We ain't -- I ain't trying to jump you. What you got the weapon for? Put the gun down. We can fight."
>
> (RR 14: 247).

Appellant asked why the victim had taken his sweater off and then started shooting at him. (RR 14: 248). After the victim had been shot once, Mr. Whitt told the jury that Appellant paused and then appeared to act as if he was thinking "Might

15

as well kill him. I done shot him." (RR 14: 255). Both he and Dews took off running and Mr. Whitt could hear shots being fired. (RR 14: 257). Right before Appellant started shooting, Mr. Whitt did not see Mr. Dews or the victim with any weapons and they were not charging at Appellant. (RR 15: 42).

3.      The State then called **Ms. Kenesha Mayfield**, an assistant manager at "Champs" a sporting goods store in the mall. (RR 15: 46). She identified Appellant as a former employee. (RR 15: 47). Appellant worked approximately 2 ½ weeks before the shooting and was not scheduled to come to work on the day of the offense alleged by the indictment. (RR 15: 47). She arrived at the mall around 9:00 and had spoken to Appellant before she arrived. (RR 15: 47). She also saw Appellant when she arrived and he was exiting the mall. (R 15: 48). She could not remember what they spoke about but agreed that it was not anything significant. (RR 15: 48).

Ironically, She also stopped and spoke to the victim as he was leaving the mall with another man and gave him a hug. She went to school with the victim and hadn't seen him in awhile. (RR 15: 49). The other man, which the evidence shows was Mr. Dews, continued on out of the mall while she and Christopher Mass spoke to each other. (RR 15: 49). According to this witness, neither Appellant nor the victim appeared upset or gave the appearance that anything was wrong. (RR 15: 50). Less than 15 minutes later, there was chaos in the mall and it was obvious to Ms. Mayfield

16

that something had happened. (RR 15: 50). She did not go outside and was unaware of what had occurred in the parking lot. (RR 15: 52).

4.     After Ms. Mayfield left the stand, the State called **Mr. Quinton Smith**. (RR 15: 54). He was at the mall on the morning of the shooting to see if he could buy a pair of shoes. He saw the victim and Mr. Whitt and was talking with them when Appellant showed up at the mall. (RR 15: 56). He later saw Appellant "get into it" with Mr. Dews by the Chick-Fil-A and they were not having a friendly conversation. (RR 15: 55-56). It was a loud conversation and he noticed Appellant motioning Mr. Dews to follow him outside. (RR 15: 57-58). He followed Appellant, Mr. Dews, the victim and Mr. Whitt when they left to go outside. When he went outside, he saw Appellant at his car and Mr. Dews was "kind of, like, parallel to the car that was between Chris' and Ricky's. And then I seen Chris taking off his jacket and putting it in the car." (RR 15: 59). He then saw Appellant pull a gun out of his car and "immediately" cocked the gun and pointed it at the victim. (RR 15: 60). As he pointed the gun, Mr. Smith heard Appellant saying something to the effect of "I told y'all I was going to be ready." (RR 15: 60). He then saw Mr. Whitt trying to calm Appellant down and to get him to put the gun away. (RR 15: 61). Appellant then started firing at the victim and he saw him get hit. (RR 15: 61). He stepped back inside the mall to look for security. When he went back outside after the shooting,

17

he saw Chris Mass on the ground bleeding and struggling to breathe. (RR 15: 62-63).

According to this witness, Appellant fired "two or three" times. (RR 15: 63). The jury

then heard the following testimony from Mr. Smith:

Q. This whole time you were outside, before the shots rang out, did you see anybody, at any time, throw a punch at Mr. Neal?

A. Not at all.

Q. Charge Mr. Neal?

A. Not at all.

Q. Move around the car with -- around towards him?

A. Not at all.

Q. No aggressive move whatsoever?

A. No, sir.

Q. Then you saw Mr. Neal shoot him in the chest?

A. Yeah.

(RR 15: 63).

On cross-examination, Mr. Smith told the jury that he only knew of the victim

from seeing him at clubs and did not personally know him. (RR 15: 65). He didn't

know Mr. Dews at all. (RR 15: 67). He knew Mr. Whitt but was not friends with him.

He told the jury it was a coincidence that they all were at the mall at the same time to

buy shoes. (RR 15: 68). He stated that he did not speak to any of these men on the

18

phone before he came to the mall. 9RR 15: 69-70). He did not hear Appellant say anything to Mr. Dews as he was motioning for Dews to follow him outside. (RR 15: 71).

**5.**     The State then called **Ms. Tamara Norris**, Appellant's girlfriend of four years. (RR 15: 85). She first told the jury that she refused to come talk to prosecutor prior to trial. (RR 15: 85). She told the jury that she and Appellant came early to the mall on the day of the offense to buy shoes. 9RR 15: 87). She remained in the vehicle as Appellant went inside. Shortly thereafter, Appellant came back to the car:

> Ricky gets out to go in the mall to buy the shoes because he was going to run in real quick to get the shoes and come on out. And he hadn't been in there but for a few minutes, and he comes back out of the hall and he hands me my debit card and he was like, "Go in there and get the shoes."

> (RR 15: 89).

When Appellant came out, she noticed that three others were following him. Appellant gave her a debit card and said "These niggers tripping." (RR 15: 92). She recalled telling police that the men were arguing amongst themselves and she could not recall if Appellant was saying anything. (RR 15: 95). She continued towards the mall until she heard the sound of gun being cocked and then she started to run into the mall. (RR 15: 97). Ms. Norris told the jury that prior to coming to the mall, Appellant had placed a black bag on the back seat of her vehicle. (RR 16: 15-16).

19

According to her, Appellant would usually carry "hair grease, hair brush, probably deodorant, just personal things" in the bag. (RR 16: 16). When Appellant told her about the others "tripping" he appeared upset and she could tell from his face that something was going on. (RR 16: 20). Ms. Norris did not remember telling police on the day of the offense that Appellant walked to the passenger side of her car and opened the back door. (RR 16: 25). She had a feeling that something was going to happen, but she did not know what it was going to be. (RR 16: 31-32).

Ms. Norris admitted that she had in a prior statement told police that Appellant said to the other men "This is what you want to do? This is what y'all want to do?" while standing by the passenger side of her car. (RR 16: 41). She did not see any of the men that were there displaying a weapon. (RR 16: 43). She began running towards the mall upon hearing Appellant cock his pistol and once inside, she heard gunshots. (RR 16: 44). She reluctantly admitted that she believed that Appellant was the person who fired the gun. (RR 16: 46). She reported to a security officer that a shooting had taken place outside because she believed that Appellant had just shot someone. (RR 16: 49).

When she went outside, she saw Appellant standing by her car talking on the phone and the victim was on the ground bloodied and trying to breathe. (RR 16: 51). Ms. Norris told the jury that although Appellant looked upset, he did not appear to be

20

afraid. (RR 16: 55). She knew that Appellant carried a gun. (RR 16: 63). She had also once seen him put the gun in the black bag that he carried with him and which he had loaded into her car on that day. (RR 16: 64).

**6.** The next witness relevant to the issue of self-defense was Tyler Police Department **Detective Donald Malstrom**. (RR 16: 160). He was involved in the investigation in this case. In the context of this point of error, Det. Malstrom told the jury that he found no weapons in the victim's car. (RR 16: 172). He recovered four spent shell casings at the scene and Appellant's .40 caliber semi-auto handgun. (RR 16: 179-80). The victim's body was laying approximately 31 feet from where Appellant was said to be standing as he shot. (RR 16: 200).

**7.** The State then called Tyler Police Department **Detective Craig Shine**, who was also involved in the investigation. (RR 16: 215). Det. Shine was the primary investigator in this case. (RR 16: 221). He interviewed Appellant on the morning of the murder. (RR 16: 222). Appellant was heard telling Det. Shine on the video of his interview that he had said to Mr. Dews while in the mall "I don't even know why you speaking on me. I'm not some other dude out here, Bro. You don't scare me. I don't fear you." (RR 16: 226). Appellant mentions in his brief that both the victim and Mr. Dews are "both large men." (Appellant's brief at 12). In regards to Appellant's size the record shows:

Q. (By Mr. Wood) Detective Shine, while we're in the process of describing individuals, how big a guy is Ricky Neal?

A. He's a good-sized fellow.

Q. Okay. Did you ever pat him down or anything and search weapons or anything on him?

A. I did. At one point, he asked to go to the bathroom and I patted him down.

Q. Okay. Muscular guy?

A. I told one of the guys I worked with, "It's like patting down a tree trunk in khakis." Seemed like a pretty solid guy to me.

(RR 16: 231).

More importantly, Appellant made it clear to Det. Shine that when he pulled his gun out and started shooting, there were no threats being made to his life:

Q. Okay. In his words, he cocks the gun; is that correct?

A. Yes, sir.

Q. And Dews, when he cocked the gun, ran. Is that what he said?

A. Yes, sir.

Q. And then he shot at Christopher Mass?

A. Yes, sir.

Q. Why did he say that he shot at Christopher Mass?

A. Chris had been in his vehicle and he couldn't see through the car.

22

Q. Ultimately, you asked did he have a weapon. And what was his response to that?

A. No, he did not.

(RR 16: 232).

Appellant told Det. Shine that when he went to the back seat of his car to grab his gun Dews was approximately "five to 6 feet" away and that the victim was standing "about twenty feet" from him. (RR 16: 234). He told the detective during the interview that he did not know Christopher Mass at all. (RR 16: 234-35). Appellant confirmed during the interview that he never saw either Dews or the victim with a weapon before he shot at them. (RR 16: 235). Appellant told the detective that he did not consider Mr. Dews to be a threat. (RR 16: 235). Even though he repeatedly told the detective that he saw no weapons, Appellant claimed to have shot Christopher Mass simply because he "[didn't] know if Christopher Mass got a weapon out of the car." (RR 16: 235). Appellant was not afraid of Mr. Whitt either, and described him during the interview as a friend of his. (RR 16: 236).

Appellant also diagramed the scene for Det. Shine. In his drawing Appellant showed that he was standing a short distance from the passenger side of his girlfriend's car and he drew the victim moving from the driver's door of his car to near the rear end of the vehicle on the driver's side. (RR 16: 239-39; RR 19: State's Exhibit #58). Appellant said that he was in fear of his life when he shot the victim. (RR 16:

241). However, he also shot at Mr. Dews, who was running away from him when he fired. (RR 16: 247). The interview further revealed that prior to the shots being fired, nobody had threatened Appellant, nobody had used force against him and he saw no weapons on either Dews or the victim. (RR 16: 247; RR 17: 43-44). In conflict with the testimony of other witnesses, Appellant also told Det. Shine that he was unaware that Dews and the victim had followed him out into the parking lot. (RR 16: 249).

Appellant also told the detective if "he had had some tennis shoes, it would have been a whole different ball game." (RR 16: 251). Detective Shine took this to mean that he would have fought with Dews. (RR 16: 251). And, even though Dews was standing in much closer proximity to him than the victim at the time of the shooting, Appellant repeatedly told Det. Shine that he did not feel threatened by Dews. (RR 16: 256). Appellant "made it clear" that he did not know the man he had killed by telling Det. Shine that repeatedly. (RR 16: 257; RR 17: 44). According to his investigation, Det. Shine concluded that Appellant had "accepted the challenge" to fight with Dews in the parking lot. (RR 16: 258).

In addition to Appellant repeatedly telling Det. Shine that he never saw a weapon on Dews or the victim, the jury also heard:

> Q.   Obviously, throughout this investigation, people are coming to you and telling you kind of stories about what's going on at the scene, right?

24

A. Yes, sir.

Q. There were civilians out there, correct, I guess, at the scene?

A. Yes, sir.

Q. First responding officer's there at the scene, right?

A. Yes, sir.

Q. Did anybody out there at the scene ever communicate to you that anybody else was in possession or had or was hiding or anything else, throwing on top of roofs, a weapon?

A. No, sir.

(RR 17: 44).[1]

The jury also heard that Detective Shine did not uncover during his investigation any evidence that indicated that Mr. Dews, the victim and Mr. Whitt had formulated a plan to attack Appellant that morning at the mall. (RR 17: 50).

After Det. Shine left the stand. The State rested its case-in-chief. (RR 17: 59). Appellant did not make a motion for a directed verdict before calling his first witness. (RR 17: 59-61). Furthermore, Appellant asserted his right to refuse to testify and the jury did not hear any direct evidence from him concerning his actions during the murder of Mr. Mass. (RR 17: 137).

---

[1] As further illustration of the nature of the testimony concerning Mr. Dews or the victim having a weapon, the trial court told Appellant's attorney, "I've heard zero evidence of anyone in the parking lot, other than your client, having a weapon." (RR 17: 131).

25

**D.      The Evidence Supported the Jury's Verdict**

Appellant contends the proof is insufficient to show beyond a reasonable doubt that he was not acting in self-defense when he shot Mr. Mass. However, it is undisputed that every eyewitness to the shooting testified that neither Mr. Dews, the victim, or Mr. Whitt were displaying weapons, charging towards Appellant, attempting to physically attack him, or making verbal threats upon his life prior to the moment when Appellant fired three rounds into the victim's head and chest. He then shot at least once at Mr. Dews as he was running away from the scene. In fact, the evidence was further undisputed that Mr. Dews began backing away from Appellant once he pulled and cocked his gun and that the victim was standing with his arms crossed approximately twenty feet away from Appellant when he was shot.

The *Jackson v. Virginia* standard of review allows a jury to resolve fact issues and to draw reasonable inferences from the evidence. *Jackson*, 443 U.S. at 319; *Lucio v. State*, 351 S.W.3d 878, 894 (Tex.Crim.App. 2011). With respect to testimony of witnesses, the jury is the sole judge of the credibility and weight to be attached thereto, and when the record supports conflicting inferences, the Court should presume that the jury resolved the conflicts in favor of the verdict, and defer to that determination. *Jackson*, 443 U.S. at 319. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the

incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13.

From the record, Appellant did not have a reasonable belief that deadly force was immediately necessary under the facts as presented to the jury. TEX. PENAL CODE ANN. §§ 1.07(a)(42), 9.32(a), (b) (Vernon 2012); *Whipple v. State*, 281 S.W.3d 482, 496-497 (Tex.App. – El Paso 2008, *pet. ref'd*). A jury may reasonably base its rejection of a self-defense claim on "inconsistencies between Appellant's version of the events and the physical and medical evidence, and the testimony of other witnesses." *Id*. at 497. In addition, given Appellant's video statement was inconsistent with practically every witness to the shooting, "the jury could have found that the self-defense claim was simply not believable." *Id*. at 497.

The law provides that the jury is free to resolve the conflict in favor of the State. *Davis v. State*, 840 S.W.2d 480, 483 (Tex.App. – Tyler 1992, *pet. ref'd*). "When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App. 2007). "What weight to give contradictory testimonial evidence is within the sole province of the jury, because it turns on an evaluation of credibility and demeanor." *Cain v. State*, 958 S.W.2d 404, 408-409 (Tex.Crim.App. 1997).

Importantly, "[d]efensive evidence which is merely consistent with the physical evidence at the scene of the alleged offense will not render the State's evidence insufficient since the credibility determination of such evidence is solely within the jury's province and the jury is free to accept or reject the defensive evidence." *Saxton*, 804 S.W.2d at 914. And, "simply because appellant presented a different version of the events, the evidence is not rendered insufficient." *Anderson v. State*, 701 S.W.2d 868, 872 (Tex.Crim.App. 1985).

Thus, viewed in the light most favorable to the verdict, the evidence in this case was legally sufficient to support Appellant's conviction for murder and the jury's implicit rejection of his theory of self-defense. Appellant's first point of error has no merit and should be overruled.

**COUNTERPOINT TWO: The trial court properly excluded character evidence that the victim may have allegedly been a gang member.**

**A.     Summary of Argument**

Appellant's second point alleges that the trial court in refusing to admit evidence that Appellant's attorney had been informed by a police gang expert that the victim, Christopher Mass, was an "active member" of the Rolling Sixties street gang. (Appellant's brief at 16-18). However, the trial court correctly ruled that such evidence was not admisible where Appellant did not know the victim and was

28

completely unaware of the victim's background. And, there was no evidence that the victim was the first agressor in this case.

## B.     The Standard of Review

This Court should review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim.App. 2002). An abuse of discretion occurs when the trial court acts arbitrarily or unreasonably, without reference to guiding rules or principles. *See Montgomery v. State*, 810 S.W.2d 372, 380 (Tex.Crim.App. 1990). The trial court is given wide discretion and latitude in its decision and this Court should not reverse an evidentiary ruling as long as it is "within the zone of reasonable disagreement." *Torres*, 71 S.W.3d at 760. The trial court's ruling should not be disturbed under an abuse of discretion standard simply because this Court might decide a question differently than the trial judge. *Montgomery*, 810 S.W.2d at 391. Moreover, an appellate court may uphold the trial court's ruling on the admission or exclusion of evidence on any legal theory or basis applicable to the case. *Martinez v. State*, 91 S.W.3d 331, 336 (Tex. Crim.App. 2002).

Appellant here asserts error in the exclusion of alleged evidence that the victim was an active member of a criminal street gang. In denying Appellant's request for admission of this evidnece, the trial court relied heavily upon the Court of Criminal

Appeals' decision in *Ex parte Miller*, 330 S.W.3d 610 (Tex.Crim.App. 2009). (RR 14: 8, 11). In *Ex parte Miller*, the Court was reviewing an application for a writ of habeas corpus alleging ineffective assistance of counsel for several grounds, one of which was that counsel "failed to present testimony regarding prior acts of violence committed by the deceased and his companion." *Id*. at 614-15. In refusing relief on that ground the Court explained:

> The rules of evidence permit the defendant to offer evidence concerning the victim's character for violence or aggression on two separate theories when the defendant is charged with an assaultive offense, as applicant was in this case.
>
> First, the defendant may offer reputation or opinion testimony or evidence of specific prior acts of violence by the victim to show the "reasonableness of defendant's claim of apprehension of danger" from the victim. This is called "communicated character" because the defendant is aware of the victim's violent tendencies and perceives a danger posed by the victim, regardless of whether the danger is real or not. This theory does not invoke Rule 404(a)(2) because Rule 404 bars character evidence only when offered to prove conduct in conformity, *i.e.*, that the victim acted in conformity with his violent character. Here, the defendant is not trying to prove that the victim actually is violent; rather, he is proving his own self-defensive state of mind and the reasonableness of that state of mind.
>
> Applicant did not know Burleson; he was unaware of his character for violence. Thus, applicant's counsel did not, and could not, offer "communicated character" evidence.
>
> Second, a defendant may offer evidence of the victim's character trait for violence to demonstrate that the victim was, in fact, the first aggressor. Rule 404(a)(2) is directly applicable to this theory and this

30

use is called "uncommunicated character" evidence because it does not matter if the defendant was aware of the victim's violent character. The chain of logic is as follows: a witness testifies that the victim made an aggressive move against the defendant; another witness then testifies about the victim's character for violence, but he may do so only through reputation and opinion testimony under Rule 405(a). [footnotes omitted].

*Ex parte Miller* 330 S.W.3d at 618-19.

## C.    Application to the Facts of the Case

In the instant case, there has been no extrinsic evidence that the victim was in fact an "active member" of a criminal street gang. In support of his proffer at trial, Appellant merely informed the Court that he had received "a letter from Detective Miller saying that he believes Mr. Mass to be in the Rolling 60s street gang." (RR 13: 286-87). The letter was not made part of this record, and the State disputed that the victim was an "active" member, although admitted that he may have been an associate of the gang. (RR 13: 289) ("I can't say, Your Honor, whether or not he's actually documented as a member of the Rolling 60s or if it's just an affiliation with that gang, the Rolling 60s. Again, I'm not trying to sit here and tell this Court that I don't necessarily know if Chris Mass was affiliated with certain gang members, the Rolling 60s or whatever.").

Moreover, Det. Miller, a criminal street gang expert, was called by the State as a punishment witness in this case and Appellant did not seek any testimony from him

regarding this claim. (RR 18: 62- 87).[2] As such, the Court does not have sufficient record before it to accurately review this point and it should be overruled on that basis. *See*, TEX. R. APP. PROC. Rule 38.1 (i) (Vernon 2015) ("[Appellant's] brief must contain . . . appropriate citations to authorities and to the record.").

More importantly the record supports the trial court's exclusion of the alleged evidence of the victim's gang membership. Appellant told Det. Shine several times during his interview that he did not know who the man was that he shot. (RR 16: 257; RR 17: 44). There is likewise no other evidence from any other source at trial that showed that Appellant knew who he had killed. Consequently, the evidence of the victim's alleged "active" membership would not be admissible under the "communicated character evidence" theory discussed above by the Court of Criminal Appeals in the *Ex parte Wheeler* case. *See Ex parte Miller* 330 S.W.3d at 618-19.

Similarly, the same evidence would not be admissible under the "uncommunicated character evidence" theory described in *Ex Parte Wheeler* because there is absolutely no evidence in the record that the victim was the first aggressor. *See Ex parte Miller* 330 S.W.3d at 618-19. The record instead shows that only Dews

---

[2] Ironically, Det. Miller was called to establish that, based upon the "constant theme of Bloods or a Blood set" seen in Appellant's tattoos, there was a "high probability" that he was himself a member of a criminal street gang. (RR 18: 73-83; RR 19: State's Exhibits P4-P25).

32

and Appellant had angry words while inside the mall and that the victim had no contact with Appellant during that argument. (RR 14: 244; RR 17:13). The evidence further showed that Christopher Mass was standing at least 20 feet away from where Appellant and Mr. Dews were getting ready to fight when he was shot. Every eyewitness to the murder, including Appellant, stated that Christopher Mass was standing by his car and not making any aggressive moves towards Appellant when Appellant started shooting. (RR 14: 57-58, 61; RR 15: 42, 63; RR 16: 232, 247; RR 17: 43-44). Notably, Appellant did not even inform the trial court that he had a reputation or opinion witness available and able to testify concerning the victim's character for violence.

Consequently, the facts of this case are very consistent with those discussed in by the Court of Criminal Appeals in *Ex parte Miller* in deciding that the character evidence of the victim in that case was not admissible. *See Ex parte Miller*, 330 S.W.3d at 618-19. Where the trial court properly applied the law to the facts of this case, there was no abuse of that court's discretion as alleged under this point of error and it should be overruled. *See Martinez*, 91 S.W.3d at 336.

**COUNTERPOINT THREE: The contentions raised in Appellant's third point of error should be overruled as multifarious. Alternatively, the trial court did not err in the exclusion of evidence concerning the victim's alleged membership in a criminal street gang.**

33

**A.      Summary of Argument**

Appellant argues under his multifarious third point that the trial court erred in limiting his cross examination of Mr. Dews to exclude evidence that he knew the victim through "members of the West Side Crips." (Appellant's brief at 19). Appellant argues under the same point that the trial court violated his 6th Amendment right to confrontation in preventing him from cross-examining Mr. Dews on the manner in which the victim's pants were worn low allegedly making him "look like a violent thug." (Appellant's brief at 20). Appellant also complains that the trial court's exclusion of this testimony made him unable to "make a record from which to argue [why] the witness might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial." (Appellant's brief at 21).

However, the law provides that multifarious points of error are improper and this point should be overruled for being multifarious. In addition, where the trial court properly decided that evidence of the victim's alleged gang membership was not admissible, the court correctly sustained the State's objections to Appellant's attempt to "back door" that same evidence during his cross-examination of Mr. Dews.

In any event, the record included photographs of the victim lying dead where he was shot and which depict the manner in which he was dressed. (RR 19: State's Exhibits 50-53).

34

**B. Multifarious points are improper and present nothing for review**

A point of error or argument is multifarious if it combines more than one contention in the point or argument. *See Sterling v. State*, 800 S.W.2d 513, 521 (Tex.Crim.App. 1990); *Michael v. State*, 864 S.W.2d 104, 109 (Tex.App. - Dallas 1993, *no pet*.). Here, Appellant argues under a single point the alleged improper exclusion of two separate pieces of evidence under two separate legal theories and also complains that the trial court improperly prevented him from making a record. By combining more than one contention under a single point of error, Appellant presents nothing for review. *Sterling*, 800 S.W.2d at 521; *see also Murphy v. State*, 864 S.W.2d 70, 72 (Tex.App. - Tyler 1992, *pet. ref'd*) ("The failure of an appellant to separate federal and state issues into separate grounds allows the point of error raising constitutional challenges to be overruled as multifarious."). Appellant's third point of error should be overruled.

**C. There was no error**

In the interest of judicial economy, the State would refer the Court to its arguments in response to Appellant's second point regarding the trial court's discretion in properly excluding any evidence concerning the alleged membership of the victim in a criminal street gang. The State would submit that, since the trial court correctly excluded the evidence of the victim's gang membership under the reasoning

35

argued by the State above, the same evidence was clearly not admissible through the "back door" in allegedly "impeaching" Mr. Dews on cross-examination. *See Ex parte Miller*, 330 S.W.3d at 618-19.

Moreover, Appellant's curious claim that the trial court somehow prevented him from "making a record" is entirely adverse to the record of this case - which includes an extensive discussion between the parties and the trial court specifically concerning the admissibility of evidence of the victim's possible gang membership. (RR 14: 7-13). Similarly, Appellant's proffer that the evidence of the manner in which the victim wore his pants made him "look like a violent thug" is also contained in the record. (RR 14: 119).

Based upon the arguments in this brief's response to Appellant's second point, the trial court properly excluded the evidence of the victim's alleged gang membership from Appellant's cross-examination of Mr. Dews. There is no merit to this point and it should be overruled.

**COUNTERPOINT FOUR: The trial court properly charged the jury on the law of self-defense.**

**A.      Summary of Argument**

Appellant's fourth point of error complains that the trial court improperly charged the jury regarding the law of self-defense by submitting to the jury an

instruction which accurately followed Texas Penal Code § 9.31. (Appellant's brief at 22-34). The evidence in this case supported such a charge and the instruction correctly stated the law of self-defense as applied to the facts of the offense.

## B.    Standard of Review

In analyzing a jury-charge issue, the Court's first duty is to decide if error exists. *Almanza v. State*, 686 S.W.2d 157, 174 (Tex.Crim.App. 1985). Only if error is found should the Court then consider whether an objection to the charge was made and analyze for harm. *Id*. "The degree of harm necessary for reversal depends upon whether the error was preserved." *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996). If "an error is preserved with a timely objection...then the jury-charge error requires reversal if the appellant suffered some harm as a result of the error." *Sanchez v. State*, 376 S.W.3d 767, 774 (Tex. Crim. App. 2012) *citing Almanza*, 686 S.W.2d at 171. The failure to preserve jury-charge error is not a bar to appellate review, but rather it establishes the degree of harm necessary to the reversal. *Warner v. State*, 245 S.W.3d 458, 461 (Tex.Crim.App. 2008).

When determining whether a defendant suffered harm, "the reviewing court must consider: (1) the entire jury charge; (2) the state of the evidence, including the contested issues and weight of probative evidence; (3) the argument of counsel; and (4) any other relevant information revealed by the record of the trial as a whole." *Id*.

37

To establish harm, the "appellant must have suffered actual, rather than theoretical, harm." *Id*.

In addition, a charge limiting a defendant's right of self-defense is properly given when (1) self-defense is an issue, (2) there are facts in evidence that show the defendant sought an explanation from or discussion with the victim concerning their differences, and (3) the defendant was unlawfully carrying a weapon. *See* TEX. PENAL CODE ANN. § 9.31(b)(5)(A) (Vernon 2013); *Lee v. State*, 259 S.W.3d 785, 789 (Tex. App. - Houston [1ˢᵗ Dist.] 2007, *pet. ref'd*). To determine whether the limitation was warranted, the Court should view the evidence in the light most favorable to giving the instruction. *See Fink v. State*, 97 S.W.3d 739, 743 (Tex.App. - Austin 2003, *pet. ref'd*). If there is any evidence raising a fact issue on the limitation, an instruction should be submitted. *Bumguardner v. State*, 963 S.W.2d 171, 175-76 (Tex. App. - Waco 1998, *pet. ref'd*).

## C. Application to the Facts of the Case

In this case, the evidence showed that Appellant had established a relationship with Mr. Dew's wife while Dews was in prison. (RR 14: 36). After he got home from prison, Mr. Dews had seen a text message from Appellant to his wife asking her why she had gone back to Mr. Dews. (RR 14: 36). Dews replied to the text message telling Appellant to stay out of his business. (RR 14: 36). A few weeks prior to the killing

38

of Christopher Mass, Dews and his wife were in the shoe store where Appellant worked and Appellant was "was acting strange, like he knew me." (RR 14: 38). No words were exchanged at that time and it was only later that Dews learned from a friend that it had been Appellant who was acting strangely towards him. (RR 14: 38-39). As a result of this testimony, the jury was aware that there was a point of contention between the two concerning Mrs. Dews. It would not be surprising to the jury then to hear that, on the day of the murder, Appellant and Dews had another confrontation that led to a challenge to settle their differences outside. (RR 14: 40-42, 62, 235-37, 243; RR 15: 55-58). However, instead of immediately squaring off once they got outside, Appellant led Dews and the victim towards his girlfriend's vehicle where he had concealed his semi-auto pistol.[3] Then, with the stated intent of showing Dews and the victim "about me," he pulled the pistol and proceeded to shoot and kill Mr. Mass. (RR 14: 52, 216).

The evidence further showed that Appellant had only recently obtained the gun and had begun carrying it around with him in a black bag. (RR 16: 64). As the trial

---

[3] Appellant has persistently and incorrectly stated that Dews and the victim "pursued" him out of the mall. *See* (Appellant's brief at 12, 34, 37, 74). However, there is absolutely no evidence of anyone chasing Appellant in the record. The testimony of the eyewitnesses, and the mall security videos, both show that Appellant motioned for Dews to follow him and that every one involved had walked outside. (RR 14: 42-43, 62, 208, 235-37; RR 15: 57-58). The victim even stopped in his "pursuit" of Appellant to briefly speak to an old friend on his way out to the parking lot. (RR 14: 211; RR 15: 49).

court reasoned, the law allowed for the weapon to be concealed in Appellant's girlfriend's car, but not to display it in a public parking lot. (RR 17: 176). *See* TEX. PENAL CODE ANN. § 46.02 (a) (2) (Vernon 2013).

Although not argued at trial, the record is less than clear whether Appellant was legally entitled to carry his gun in his girlfriend's car. Penal Code § 46.02 (a) (2) only permits a gun to be carried inside a vehicle "that is owned by the person or under the person's control." *See* TEX. PENAL CODE ANN. § 9.31(b)(5)(A) (Vernon 2013). The evidence at trial showed that the Appellant's girlfriend repeatedly referred to the vehicle as being hers, that she drove Appellant to the mall, and was still sitting in the driver's seat shortly before the offense occurred. (RR 15: 90-92; RR 16: 16, 26, 42, 50). There was absolutely no evidence at trial that Appellant owned the vehicle, or had control of it at the time of the offense. As such, he was not legally carrying his pistol in the car. *See Moore v. State*, 392 S.W.3d 697 (Tex. App. Dallas 2010, *no pet.*) (defendant not entitled to self-defense charge where he possessed a handgun and was "neither on premises he owned or controlled nor en route to a vehicle he owned or controlled.").

Moreover, once Appellant pulled the gun out of his girlfriend's car, the trial court explained that he was in commission of the offense of unlawfully carrying a weapon. (RR 17: 176). ("A shotgun, you can have that outside your vehicle safely.

40

No illegality there as I understand the law. . . Concealed handgun weapons, though, make a completely different event."); *see also* (RR 15: 105) ("I think having a gun in a car at a public mall - haven't had to look at it, but I suspect probably having it in the car is not an illegal act. . . Once you choose to retrieve the gun from the car and display it publicly, I think you probably trigger this unlawful carrying of a handgun - particularly, if you don't have a license.").

Consequently, there was evidence in the record upon which the jury could have decided that Appellant was not entitled to the defense of self-defense under Penal Code § 9.31(b)(5)(A) where he was unlawfully carrying a weapon. The law provides that if there is any evidence raising a fact issue on the limitation, an instruction should be submitted. *Bumguardner*, 963 S.W.2d at 175-76. There was thus no error for the trial court to submit the complained-of charge and Appellant's fourth point should be overruled.

COUNTERPOINT FIVE: **Where the trial court properly charged the jury on the law of self-defense, as charge on necessity was not applicable.**

A.     **Summary of Argument**

Appellant argues under his fifth point that the trial court erred when it refused his requested charge of necessity found under Penal Code § 9.22. (Appellant's brief at 35-39). However, there was no error where the law provides that where self-

defense is an issue raised at trial, a charge of necessity under that section of the penal code is inapplicable.

**B.    The Law of Necessity**

Under Section 9.22 of the Texas Penal Code, conduct is justified under necessity, if

    (1)    the actor reasonably believes the conduct is immediately necessary to avoid imminent harm;

    (2)    the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and

    (3)    a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear.

TEX. PENAL CODE ANN. § 9.22 (Vernon 2013).

Thus, if there is a plain legislative purpose to exclude the defense of necessity, then subsection (3) precludes its application. Courts have consistently held that a defendant is not entitled to an instruction on necessity when self-defense using deadly force is an issue since including an instruction on necessity "would undermine the Legislature's purpose in imposing the duty to retreat" in Section 9.32 of the Texas Penal Code. *See Searcy v. State*, 231 S.W.3d 539, 544 (Tex.App. - Texarkana 2007, *pet. ref'd*); *Butler v. State*, 663 S.W.2d 492, 496 (Tex.App. - Dallas 1983), *aff'd on*

42

*other grounds*, 736 S.W.2d 668 (Tex.Crim.App. 1987); *Hunter v. State*, No. 14-08-00202-CR, 2008 Tex.App. LEXIS 9139 at * 6-8 (Tex.App. - Houston [14[th] Dist.] Dec. 9, 2008, *no pet.*) (not designated for publication); *Wilson v. State*, No. 06-14-00021-CR, 2014 Tex.App. LEXIS 12188 at *15-17 (Tex.App. - Texarkana Nov. 7, 2014, *pet. ref'd*) (not designated for publication).[4]

Since the jury in this case was fully charged on the law of self-defense as raised by the evidence, the reasoning in these cases is applicable and controls the issue raised under Appellant's fifth point. There is no merit to that point and it should be overruled.

**COUNTERPOINT SIX: The trial court properly excluded the hearsay testimony of Mr. Wilmon Davis.**

**A.     Summary of Argument**

Appellant complains under this point that the trial court erred in excluding testimony from Mr. Wilmon Davis that he thought he might have heard someone standing in a group of pants-sagging "thugs" say "He might get shot" or "He's going to get shot." (Appellant's brief at 39-56). However, besides the obvious fact that this is blatant hearsay without any exception, Appellant has misrepresetned the record to

---

[4] The State proffers unpublished opinions to point out the reasoning of the courts therein when faced with very similar facts "rather than simply arguing without reference, that same reasoning." *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex.App. - Amarillo 2003, *pet. ref'd*).

43

make it appear as if the victim, Mr. Christopher Mass, was within this group in a vain attempt to garner merit for this point.

**B. Appellant has Misrepresented the Record**

In alleging error under this point, Appellant states that Mr. Davis testified that the victim, Christopher Mass, was amongst the "group of thugs" that he walked by when he overheard the alleged hearsay statement. *See* (Appellant's brief at 54-55) ("Davis recalled that Mass was one of the males standing in group that he overheard . . ."). This assertion is entirely incorrect as the record shows that Mr. Davis stated the following:

Q. Okay. And you thought he was part of that group, part of the sagging group?

A. Yes, sir. Yes, sir. He was - the little man - **the young man that got killed, he never moved until I saw him the last time**. He's standing on that display they had in front of Champ and JCPenney.

Q. Was he standing there with these other people?

A. No, **he's standing by himself**. I walked right by him every time I make my round, right by him.

Q. So if I understand correctly, the person that was out on the ground, the person who's deceased -

A. Yes, sir.

Q. - you did see that person in the mall?

44

A.  Yes, sir. I walked by him about four times.

Q.  And you're saying he was not part of that group where someone said -

A.  They wasn't just bundled up. They was two or three here or two or three there. **But he was always by himself**.

Q.  Okay. I'm just trying to be clear that the person that was on the ground was not part of the group or was he part of the group that said that statement?

A.  I'm going to have to say **I ain't seen him talk to nobody**. Because I always saw him every time -- it take me about five to six minutes to make my round. When I come back, I'm walking about that far from him. And he's still in the same place until I made my last round. (emphasis supplied).

(RR 17: 100-01).

Moreover, the record clearly shows that Mr. Davis could not say exactly what the statement was that he overheard from the group. He told the trial court that what he first thought he had heard was the group talking about basketball and the name "Shaq O'Neal." (RR 17: 97-98). He agreed though that "at least one interpretation" of what he heard was that "Someone's going to get shot" or words to that effect." (RR 17: 98). The State objects to all this as being improper argument to the Court. If Appellant must misrepresent the record in order to make his argument, it would appear his argument probably isn't worth the paper he used to make it, or the Court's time wasted in reviewing it.

45

## C. Hearsay

Nevertheless, the law provides that "hearsay" is essentially an out-of-court statement which a party offers in evidence to prove the truth of the matter asserted in the statement. TEX. R. EVID. 801 (d). Hearsay is generally inadmissible unless the proponent of the evidence can show that there is an exception to that inadmissibility. TEX. R. EVID. 802.

Thus, anything Mr. Davis may have heard another person say at the mall on the morning that Mr. Mass was murdered would be hearsay by definition. Appellant says there were two applicable exceptions - "excited utterance" and "present sense impression." (Appellant's brief at 55).

To constitute as an excited utterance, a statement must relate to a startling event or condition and have been made while **the declarant** was under the stress of excitement caused by the event or condition. *See* TEX. R. EVID. 803 (2); *Zuliani*, 97 S.W.3d 589, 595-96 (Tex.Crim.App. 2003). Appellant misconstrues this exception by arguing that Mr. Davis was under the influence of the shooting when he spoke to police. (Appellant's brief at 55).

However, Mr. Davis was not the "declarant" of the excited utterance hearsay statement sought to be admitted. The mystery declarant was, according to Appellant, an unidentified "thug." And, the shooting had not yet occurred when the Mr. Davis

46

overheard the statement. As such, this exception is clearly inapplicable to what Mr. Davis might have heard.

Similarly, a "present sense impression" is a "statement describing or explaining an event or condition, made while or immediately after **the declarant** perceived it." (emphasis supplied). TEX. R. EVID. 803 (1). Again, Mr. Davis is not the declarant of the hearsay statement sought to be admitted. Moreover, even assuming that Mr. Davis accurately recounted what he thought he heard, there was no evidence presented by Appellant that the actual declarant was "explaining an event or condition, made while or immediately after the declarant perceived it."

There likewise was no evidence presented that the mystery declarant was observing the argument between Appellant and Dews when the statement was made. *See Ferguson v. State*, 97 S.W.3d 293, 298 (Tex.App. - Houston [14[th] Dist.] 2003, *pet. ref'd*) *citing Wood v. State*, 18 S.W.3d 642, 651-52 (Tex.Crim.App. 1999) (holding statement not connected to contemporaneous observation was not present sense impression). In short, the testimony of Mr. Davis was clearly insufficient to establish this exception.

For these reasons there is no merit to Appellant's sixth Point or Error and it should be overruled.

**COUNTERPOINT SEVEN:  The law does not support that Appellant's trial counsel was ineffective, or that Appellant was harmed as a result.**

**A.      Summary of Argument**

In his seventh point of error Appellant argues that he was denied the effective assistance of counsel where his trial attorney failed to challenge the qualifications of the State's Gang Expert witness during the punishment phase of trial. (Appellant's brief at 57-63). Paradoxically, the gang expert, Det. Miller,  that Appellant complains was not qualified under this point is the same witness Appellant argues should have been allowed to testify that the victim, Christopher Mass, was an "active member" of the Rolling Sixties street gang under his second point. (Appellant's brief at 16-18).

Nevertheless, Appellant has failed to establish that he is entitled to any relief where the record does not demonstrate either ineffectiveness of counsel, or a resultant harm.

**B.      The *Strickland* Standard on Direct Appeal**

Traditionally, when confronted with an ineffective assistance of counsel claim from either stage of a trial, the Court will apply the two-pronged analysis set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim.App. 1986) (adopting *Strickland* as the applicable standard under Texas

Constitution). Under the first prong of the *Strickland* test, Appellant in this case must satisfy his burden to show that counsel's performance was "deficient." *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. To be successful in this regard, Appellant "must show that counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. Under the second prong, Appellant must further show that the deficient performance prejudiced his defense. *Id*. at 687, 104 S.Ct. 2052.

The appropriate standard for judging prejudice requires Appellant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694, 104 S.Ct. 2052. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. Appellant must prove both prongs of *Strickland* by a preponderance of the evidence in order to prevail. *McFarland v. State*, 845 S.W.2d 824, 842 (Tex. Crim.App.1992). Furthermore, claims of ineffective assistance must be firmly founded in the record. *Rios v. State*, 990 S.W.2d 382, 385 (Tex.App. - Amarillo 1999, *no pet*.). It is axiomatic that the review of a defense counsel's representation at trial is highly deferential. The Court should apply "a strong presumption" that counsel's actions fell within the wide range of reasonably professional assistance. *Strickland*,

466 U.S. at 689. Failure of Appellant to make either of the required showings of deficient performance and sufficient prejudice defeats the claim of ineffective assistance. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex.Crim.App. 1999).

Importantly, performance of counsel cannot generally be adequately examined based on a trial court record. *Kemp v. State*, 892 S.W.2d 112, 115 (Tex.App. - Houston [1st Dist.] 1994, *pet. ref'd*). A proper review should focus on a record specifically targeting the conduct of trial counsel. *Id*. Such a record is best developed during a hearing on application for writ of habeas corpus or motion for new trial. *Id*.; *Jackson v. State*, 877 S.W.2d 768, 771-72 (Tex.Crim.App. 1994) (Baird, J., concurring).

To find that trial counsel was ineffective based on a record silent as to why trial counsel conducted the trial as he did, would call for speculation, which is generally not permitted. *Id*. Only in rare and egregious circumstances would a record on direct appeal suffice to rebut the presumption of sound trial strategy. *Kemp*, 892 S.W.2d at 115; *Ex parte Zepeda*, 819 S.W.2d 874, 877 (Tex.Crim.App. 1991) (counsel's failure to request instruction on law of accomplice witness testimony constitutes ineffective assistance of counsel according to *Strickland* standard); *Alaniz v. State*, 937 S.W.2d 593, 596 (Tex.App. - San Antonio 1996, *no pet*.) (record reflected counsel was ineffective for allowing venire person who had been struck to sit on the jury).

**C.** **Application of the *Strickland* Standard to the Facts of the Case**

Appellant argues that counsel should have objected to the qualifications of Det.

Chris Miller when he was called to the stand as an expert witness on criminal street

gangs. Surprisingly, Appellant's counsel states in a footnote to this point that:

> The undersigned is familiar with Detective Miller having previously cross-examined him as a gang expert and challenged his opinions on appeal. The undersigned therefore knows that Detective Chris Miller is recognized as an expert witness on criminal street gangs.

> (Appellant's brief at 58, fn. 1).

This statement appears to the State to constitute a waiver of any potential harm

that could have conceivably resulted from the alleged failure of counsel to challenge

Det. Miller's qualifications. It likewise establishes for the Court that appellate counsel

agrees with Appellant's trial attorney that Det. Miller was in fact qualified to offer his

opinion as an expert on criminal street gangs. *See* (RR 18: 72) ("I do not contest the

State's assertion that Detective Miller is an expert. I fully concur with that.").

This Court has previously decided that trial counsel is not ineffective for failing

to make frivolous objections. *Sandoval v. State*, No. 12-12-00366-CR, 2013 Tex.App.

LEXIS 9497, *9-10 (Tex.App. - Tyler July 31, 2013, *pet. ref'd*) (not designated for

publication) *citing Edmond v. State*, 116 S.W.3d 110, 115 (Tex.App. - Houston [14th

Dist.] 2002, *pet. ref'd*) (trial counsel not ineffective for failing to make frivolous

51

objections). For these reasons, there is no merit to Appellant's seventh Point of Error and it should be overruled.

**COUNTERPOINT EIGHT: The Trial Court did not err in denying Appellant's requested lesser included offense charges where they were not supported by the evidence.**

**A.     Summary of Argument**

Under his eighth point of error, Appellant complains that the trial court denied his requests to charge the jury on the lesser included offenses of manslaughter, criminally negligent homicide and  deadly conduct. (Appellant's brief at 68). However, none of the requested charges were supported by the evidence at trial.

**B.     Standard of Review**

Regarding lesser included charges, courts apply a two-step analysis to determine whether an instruction on a lesser-included offense should be given to the jury. *Cavazos v. State*, 382 S.W.3d 377, 382 (Tex. Crim. App. 2012);  *Hall v. State*, 225 S.W.3d 524, 535-36 (Tex.Crim.App. 2007). The first step of the analysis is a question of law that does not depend on the evidence presented at trial. This step compares the elements of the offense as alleged in the indictment with the elements of the requested lesser offense. An offense will be a lesser-included offense where "it is established by proof of the same or less than all the facts required to establish the commission of the offense charged." TEX. CODE CRIM. PROC. ANN. Art. 37.09 (1)

(Vernon 2014). If this analysis supports a determination that the requested lesser offense is a lesser-included offense, the court will move to the second step of the test and consider whether a rational jury could find that, if the defendant is guilty, he is guilty only of the lesser offense. *Hall*, 225 S.W.3d at 536. This is a fact determination and is based on the evidence presented at trial.

If there is evidence that raises a fact issue of whether the defendant is guilty only of the lesser offense, an instruction on the lesser-included offense is warranted, regardless of whether the evidence is weak, impeached, or contradicted. *Cavazos*, 382 S.W.3d at 383.

## C.    Application to the Facts of the Case

In denying Appellant's requested lesser included offenses, the trial court stated its understanding of the facts regarding the evidence from Appellant's stand point as he explained it during his interview with police:

> THE COURT: The only evidence of what your client did is, from his perspective, is in the audio statement the State introduced as an admission. He clearly testifies that he pulled his gun out, he aimed it at Mr. Mass. He never saw a weapon there. He pulled the trigger twice. We know, now, he shot three times, at least.
>
> (RR 17: 178-79).

Appellant's trial attorney fully agreed with that statement of the facts in the record. (RR 17: 179). Thereafter, the trial court requested that Appellant provide case

law to support his requested charges because "frankly, I find it to be incredible that an appellate court would think these facts would lend to any lesser." (RR 17: 179). Counsel was unable to produce any legal authority which stood for the proposition that he was entitled to any of his lesser-included offenses under the specific facts of this case. (RR 17: 180-82). Notably, counsel did not object to the final version of the jury's charge on the basis argued under this point when the trial court requested the parties make their objections. (RR 17: 184-89).

Both manslaughter and criminally negligent homicide are lesser-included offenses of murder. *Martinez v. State*, 16 S.W.3d 845, 847 (Tex.App. - Houston [1ˢᵗ Dist.] 2000, *pet. ref'd*) (manslaughter); *Miller v. State*, 177 S.W.3d 177, 182 (Tex. App. - Houston [1ˢᵗ Dist.] 2005, *pet. ref'd*) (criminally negligent homicide).

However, a defendant's testimony that he acted in self-defense precludes a finding that there is some evidence in the record that he is guilty only of manslaughter, because a fact finder cannot find both that a defendant acted recklessly and that he acted in self-defense. *Martinez*, 16 S.W.3d at 848; *see also Alonzo v. State*, 353 S.W.3d 778, 782 (Tex.Crim.App. 2011) (noting precedents in which "[t]he very reason for denying the manslaughter charges was that the defendants' evidence was that in committing the homicide they acted intentionally in self-defense, not merely recklessly").

The record also lacks any evidence that Appellant is only guilty of criminally negligent homicide. That offense requires that a person act with criminal negligence, which involves "inattentive risk creation, that is, the actor ought to be aware of the risk surrounding his conduct or the results thereof." *Lugo v. State*, 667 S.W.2d 144, 147-48 (Tex.Crim.App. 1984); *see also* TEX. PENAL CODE § 6.03 (d) (Vernon 2013) (defining criminal negligence); *id*. § 19.05 (offense of criminally negligent homicide).

Thus, for Appellant to be have been entitled to a jury charge on criminally negligent homicide, the record must contain "some evidence" that the defendant did not intend the resulting death or know that it was reasonably certain to occur. *Miller*, 177 S.W.3d at 182. If such evidence is present, the record must contain evidence showing that the defendant was unaware of the risk. *Id*. Here, there is no evidence in the record that appellant did not intend to cause death or that he did not know it was reasonably certain to occur when he fired three rounds into the victim's body and another at the fleeing Mr. Dews. Nor does the record contain evidence that Appellant was unaware of that risk. To the contrary, intentional conduct was implicit in Appellant's statement to police. *Cf. Martinez*, 16 S.W.3d at 848.

Similarly, the offense of deadly conduct can be committed in two ways. A person commits the misdemeanor version of the offense if he recklessly engages in conduct that places another in imminent danger of serious bodily injury. TEX. PENAL

55

CODE § 22.05 (a), (e) (Vernon 2103). The felony version of deadly conduct occurs if a person knowingly discharges a firearm at or in the direction of one or more individuals. *Id*. § 22.05 (b) (1). Thus, under the facts, felony deadly conduct satisfies the first prong of the lesser-included test because it was included in the proof necessary to establish the offense of murder. *See* TEX. CODE CRIM. PROC. Art. 37.09 (1); *Ortiz v. State*, 144 S.W.3d 225, 233-34 (Tex.App. - Houston [14th Dist.] 2004, *pet. ref'd*).

However, the second part of the test for lesser included offenses requires some evidence in the record that would permit a jury to rationally find that if Appellant is guilty at all, he is guilty only of deadly conduct. *Sweed v. State*, 351 S.W.3d 63, 68 (Tex.Crim.App. 2011). Appellant would thus qualify for a lesser-included offense instruction only if the record contains evidence that, if believed by the jury, negates or refutes an element of the greater offense while providing a rational alternative finding on any associated element of the lesser offense, or is subject to different interpretations by the jury. *Cavazos v. State*, 382 S.W.3d 377, 385-86 (Tex.Crim.App. 2012).

The evidence in this case includes that Appellant pointed his gun directly at the victim and fired three times. He then also shot at the fleeing Mr. Dews. One eyewitness testified that after the first shot, which apparently hit Mr. Mass in the

chest, Appellant paused and then appeared to act as if he was thinking "Might as well kill him. I done shot him" and then continued to shoot. (RR 14: 255). Further, the jury heard that Appellant stated to Mr. Dews that he was "going to show y'all about me" before shooting Mr. Mass. (RR 14: 52). Similarly, Appellant's girlfriend told the jury that she heard Appellant say while he was getting his pistol out of her car that, "This is what you want to do? This is what y'all want to do?" (RR 16: 41).

As such, the evidence clearly indicates that Appellant fully intended to shoot to kill when he opened fire which would negate the "knowingly discharges a firearm at or in the direction" element of deadly conduct. There is thus no evidence that if Appellant is guilty at all, is guilty only of deadly conduct. The trial court properly refuse that instruction.

For these reasons, there is no merit to Appellant's eighth Point of Error and it should be overruled.

**COUNTERPOINT NINE: The Trial Court did not err in denying Appellant's requested instruction on sudden passion where it was not supported by the evidence.**

**A.      Summary of Argument**

Appellant argues under his final point that the trial court erred in submitting an instruction on sudden passion during the punishment phase. However, the facts of this case did not support such an instruction.

**B.    The Law of Sudden Passion**

A defendant convicted of murder may argue at the punishment phase that he caused the death "under the immediate influence of sudden passion arising from an adequate cause." TEX. PENAL CODE ANN. § 19.02 (d) (Vernon 2013); *see Hernandez v. State*, 127 S.W.3d 206, 210-11 (Tex.App. - Houston [1ˢᵗ Dist.] 2003, *pet. ref'd*). The defendant has the burden to prove sudden passion by a preponderance of the evidence. TEX. PENAL CODE ANN. § 19.02 (d) (Vernone 2013).

The theories of sudden passion and self-defense may arise out of the same facts. Evidence of self-defense generally raises the issue of sudden passion. In fact, "[I]t would be 'a rare instance' when issues of self-defense do not also raise issues of sudden passion." *Benavides v. State*, 992 S.W.2d 511, 525 (Tex.App. - Houston [1ˢᵗ Dist.] 1999, *pet. ref'd*). However, the converse is also true - "except in rare instances, when the State's evidence is sufficient to overcome a claim of self-defense, it will also be sufficient to show the absence of sudden passion." *Id*.

Nevertheless, sudden passion must arise at the time of the offense and cannot result solely from former provocation. *See Hernandez*, 127 S.W.3d at 213. In addition, the passion must have still existed at the time of the shooting and before there was reasonable opportunity for the passion to cool. *See Moncivais v. State*, 425 S.W.3d 403, 407 (Tex.App.-Houston [1ˢᵗ Dist.] 2011, *pet. ref'd*).

In this case, the evidence showed that Appellant agreed to fight with Mr. Dews and walked out to his girlfriend's car. He had time while leaving the mall to consider his options and the evidence shows that he made the conscious decision to not get in the car and leave, but rather to pull out his gun. The fact that Appellant led the parties out to the car and did not attempt to defend himself before reaching for his gun clearly indicates that he had time to reflect upon the situation and to make the conscious decision to engage in his murderous conduct.

Anticipation of an event and preparation of a response indicates a defendant had time to deliberate over an action and did not act under the immediate influence of sudden passion. *See McKinney v. State*, 179 S.W.3d 565 (Tex.Crim.App. 2005) (holding evidence that defendant went home, sat at his desk for some time, and then retrieved his gun in preparation for fight showed deliberation and not sudden passion).

In addition, the Court of Criminal Appeals has decided that a mere claim of fear, as the Appellant made in the instant case, does not establish the existence of sudden passion arising from an adequate cause. *Gonzales v. State*, 717 S.W.2d 355, 357-58 (Tex.Crim.App. 1986). For a claim of fear to rise to the level of sudden passion, the defendant's mind must be rendered incapable of cool reflection. *Daniels v. State*, 645 S.W.2d 459, 460-61 (Tex.Crim.App. 1983).

The evidence in this case showed that Appellant's girlfriend told the jury that he looked "upset about something" when he came to the car. (RR 16: 20). And although she could tell he was upset "about something; but it was something that came from inside the mall." (RR 16: 54). And, the look on Appellant's face was "just his usual facial expression when he's upset" which was not "any different than anything else [she'd] seen, whether it was a disagreement with [her] or anything else." (RR 16: 55). Appellant did not look afraid to her. (RR 16: 55). But again, mere fear is alone insufficient to support a sudden passion instruction. *Daniels*, 645 S.W.2d at 460-61. Appellant further held up his gun and cocked it, which caused Mr. Dews to step back and Mr. Whitt to attempept to intervene. After that period of time where Mr. Dews and the victim were frozen in place by the obvious threat to their lives, and when Appellant had clearly gained the upper hand, he nonetheless began firing.

Consequently, there was no testimony in the record to indicate that Appellant became enraged, resentful or terrified immediately prior to the shooting. Absent that level of sudeden passion, the trial court correctly concluded that Appellant was not entitled to his requested instruction. There is no merit to this Point of Error and it should be overruled.

**PRAYER**

**WHEREFORE**, for the reasons stated herein, the State of Texas prays that the Court of Appeals overrule Appellant's Points of Error and affirm the judgment of the 7th District Court, Smith County, Texas, in this case as modified.

Respectfully submitted,

D. MATT BINGHAM
Smith County Criminal District Attorney

/s/ *Michael J. West*
Michael J. West
Asst. Criminal District Attorney
Bar I.D. No. 21203300
100 N. Broadway, 4th Fl.
Tyler, Texas 75702
(903) 590-1720
(903) 590-1719 (fax)
mwest@smith-county.com

**CERTIFICATE OF COMPLIANCE**

Pursuant to Texas Rule of Appellate Procedure 9.4 (i)(3), the undersigned attorney certifies that the word count for this document is 14, 331 words as calculated by Corel WordPerfect X6.

/s/ *Michael J. West*
Michael J. West

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this __11th__ day of __September__ , 2015, the following have been completed:

(1) The original legible copy of the State's Response to Appellant's Brief in the above numbered cause has been sent via electronic filing to the Clerk of the Court of Twelfth Court of Appeals.

(2) A legible copy of the State's Response to Appellant's Brief in the above numbered cause has been been sent via electronic filing to:

Mr. G. J. Smith
Attorney at Law
2000 E. Lamar, Ste. 330
Arlington, Texas 76006

/s/ *Michael J. West*
Michael J. West
Asst. Criminal District Attorney
Bar I.D. No. 21203300
100 N. Broadway, 4th Fl.
Tyler, Texas 75702
(903) 590-1720
(903) 590-1719 (fax)